NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0350n.06

No. 22-6026

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 01, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BRIAN BOYD, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| JOSEPH MARTINEZ, et al. | ) | |
| Defendants-Appellants. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

Before: CLAY, GRIFFIN, and DAVIS, Circuit Judges.

**CLAY, Circuit Judge.** Defendant, Joseph Martinez, and his company TEK Holdings Group LLC, appeal the district court's denial of his motion to dismiss and motion for summary judgment, as well as the district court's partial grant of the motion for summary judgment brought by Plaintiff, Brian Boyd, in this declaratory judgment action. For the reasons set forth below, we **AFFIRM** the district court's order denying Defendant's motion to dismiss and motion for summary judgment, as well as the district court's order partially granting summary judgment to Plaintiff.

## I. BACKGROUND

### A. Factual History

This case has its origins in a failed business venture between Defendant Joseph Martinez ("Joe"), his brother Christopher Martinez ("Chris"), and his former boss John Altergott ("Altergott"). Chris and Joe Martinez both worked for Altergott at a company called Sayers, which

was partially owned by Altergott. Altergott and Chris both left Sayers and started their own respective IT companies. This left Joe at Sayers in charge of an important account with a hospital chain.

Joe eventually decided to join Altergott at his new IT company, so he quit his position at Sayers and took the hospital chain account to Altergott's new company. This move resulted in Sayers threatening to sue Joe and sending him a letter claiming he violated the terms of his employment agreement. Joe retained an attorney to represent him in this dispute, Brian T. Boyd (Plaintiff in this declaratory judgment action). Boyd took care of the matter by writing a letter to Sayers on Joe's behalf indicating that Joe had done nothing to violate the employment agreement, as a result of which Sayers took no further action.

After resolution of the Sayers dispute, Joe, Chris, and Altergott decided to enter into a joint venture to create an IT company called 3-D Technology Group ("3D Group" or the "joint venture") which they would all jointly own through three separate member corporate entities.[1] Boyd was allegedly retained by Joe and Chris to represent them in forming separate corporate entities that would hold their respective ownership shares in 3-D Technology Group. The joint venture subsequently failed.

In December 2018, Joe (and his corporate entity TEK)[2] sued Chris, Altergott, and their respective corporate entities (the "original lawsuit") in Williamson County Chancery Court alleging that Chris and Altergott wrongly excluded Joe from managing and governing 3D Group, distributed 3D Group's funds in an impermissible manner, and engaged in "inappropriate self

---

[1] Joe's corporate entity is called TEK Holdings Group, Chris's corporate entity is called Ryzer Services, and Altergott's corporate entity is 3-D Technology Inc.

[2] Although Joe and his corporate entity, TEK Holdings Group LLC, are both Defendants in this action, for purposes of clarity, this opinion refers solely to Joe as the Defendant in the singular since he is the sole member of TEK Holdings Group LLC.

dealing, embezzlement, and other violations of their fiduciary duties." Original Compl., R. 1-1 at Page ID #30. In January 2019, Joe and his corporate entity also filed a lawsuit in Williamson County Circuit Court[3] against Boyd (the "malpractice action"), accusing him of legal malpractice and of breach of fiduciary duty for improperly representing both him and his brother Chris despite the fact that they had materially adverse interests.

On June 29, 2019, Joe, Chris, and Altergott (along with their respective corporate entities), settled the original lawsuit and executed a settlement agreement that was intended to end all of the litigation among the parties. This settlement agreement contained the following release provision:

> Upon execution of and subject to the terms of this Agreement, except for the obligations created by this Agreement and the Related Agreements, **the Parties, on behalf of themselves,** their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, divisions, companies under common control with any of the foregoing, affiliates and assigns, **and their past, present and future** officers, directors, shareholders, interest holders, members, partners, **attorneys**, agents, employees, managers, representatives, assigns and successors in interest, **and all persons acting by, through, under or in concert with them, and each of them,** *hereby release, remise and forever discharge* **each other**, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, divisions, companies under common control with any of the foregoing, affiliates and assigns and *their past, present and future* officers, directors, shareholders, interest holders, members, partners, *attorneys*, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them, and each of them, *from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, expenses (including attorneys' fees and costs actually incurred) and punitive damages, of any nature whatsoever (collectively, "Claims"), arising prior to the Effective Date of this Agreement, throughout the universe.*

---

[3] *Joseph Martinez (et. al) v, Brian T, Boyd*, 94CC1-2019-CV-34, Williamson County Circuit Court Docket (2019).

Settlement Agreement, R. 11, Page ID #90–91 (emphasis added). The settlement agreement required any disputes relating to the enforceability or interpretation of the agreement to be mediated and litigated only in federal or state court in Davidson County, Tennessee.

Even after the settlement agreement, the Malpractice action remained pending. Boyd avers that he was not made immediately aware that the parties in the original lawsuit had signed a settlement agreement. In May 2021, Boyd amended his answers to the complaint in the malpractice action to argue that the settlement agreement foreclosed Joe's claims against him.[4] On January 4, 2022, the malpractice action was stayed pending mediation of the dispute between Boyd and Joe. Mediation between the parties was ultimately unsuccessful, but the stay remained in place.

In February 2022, Boyd filed the instant declaratory judgment action in Davidson County Chancery Court requesting that the court determine: (1) that Boyd is a third party beneficiary of the settlement agreement's release provision which bars the claims asserted in the Malpractice Lawsuit, and (2) that the settlement agreement permits Boyd to recover attorney's fees for pursuing the declaratory judgment action and for defending the malpractice action after the execution of the settlement agreement. Joe and his corporate entity removed the lawsuit to federal court on the basis of diversity of citizenship.

**B. Procedural History**

After the declaratory judgment action was removed to federal court, Joe moved to dismiss the action on the basis of the abstention doctrine articulated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Boyd filed the settlement agreement, opposed the

---

[4] In November of 2021, Boyd also filed a motion for judgment on the pleadings in the malpractice action. Boyd later withdrew the motion for judgment on the pleadings in the state malpractice action pending the adjudication of the federal court declaratory judgment action.

motion to dismiss, and moved for summary judgment on the basis that the settlement agreement precluded any claims against him relating to his representation of Joe or his corporate entity in the 3-D Group joint venture. Joe opposed the motion for summary judgment and filed his own motion for summary judgment, arguing that the settlement agreement does not contemplate the release of the claims made in the malpractice litigation.

The district court denied Joe's motion to dismiss and motion for summary judgment and granted in part Boyd's motion for summary judgment. The district court denied the motion to dismiss because it determined that *Colorado River* abstention was not warranted. The district court denied Joe's motion for summary judgment and granted in part Boyd's motion for summary judgment because it determined that the settlement agreement explicitly released the claims made by Joe against Boyd in the malpractice action. The district court denied Boyd's motion for summary judgment with respect to his request for attorney's fees because the settlement agreement's attorney's fees provision did not apply to Boyd, since he was not a listed party in the agreement.

Joe and his corporate entity, TEK Holdings, timely appealed. On appeal, Joe argues that (A) the district court erred in denying his motion to dismiss based on *Colorado River* abstention doctrine and (B) that the district court erred in granting summary judgment to Boyd on the scope of the settlement agreement, since Tennessee rules of contract interpretation require courts to consider extrinsic evidence of intent when interpreting a contract.

## II. STANDARD OF REVIEW

In general, we review a district court's abstention decisions *de novo*. *Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 571 (6th Cir. 1994) (reviewing de novo district court's grant of a motion to dismiss on the basis of *Colorado River* abstention doctrine) (citing *Heitmanis v.*

*Austin,* 899 F.2d 521, 527 (6th Cir. 1990)). In this case, however, the action that was removed from state court was a declaratory judgment action pursuant to Tenn. Code Ann. § 29-14-101. We review a district court's decision to hear a declaratory judgment action for abuse of discretion. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–90 (1995). This standard of review applies even when the declaratory judgment action was initiated in state court and then removed to federal court. *See Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 796 (6th Cir. 2022) (reviewing for abuse of discretion district court's decision declining to hear declaratory judgment action removed to federal court from Ohio state court).

This Court reviews a district court's grant of a motion for summary judgment *de novo*. *See Thacker v. Ethicon, Inc.*, 47 F.4th 451, 458 (6th Cir. 2022). Summary judgment is properly granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. ANALYSIS

### A. Motion to Dismiss

Joe argues that the district court erred by denying his motion to dismiss because the *Colorado River* doctrine warrants abstention in this case and because Boyd lacks standing to bring this suit.[5] The Supreme Court's decision in *Colorado River* articulated several factors that federal courts must consider in deciding whether to abstain from their "virtually unflagging obligation" to decide cases within their jurisdiction when there is a parallel state action. 424 U.S. at 817. First, the district court must determine that the two actions are parallel, then it can consider:

> (1) whether federal or state law provides the basis for decision of the case;
> (2) whether either court has assumed jurisdiction over any *res* or property;

---

[5] Because Joe makes the same argument with respect to standing in his motion for summary judgment and in his opposition to Boyd's motion for summary judgment, this opinion will address this argument in Section B, *infra*.

(3) whether the federal forum is less convenient to the parties;

(4) avoidance of piecemeal litigation; and

(5) the order in which jurisdiction was obtained.

*Baskin*, 15 F.3d at 571.

The district court determined that the state malpractice action was not parallel to the federal proceeding and declined to abstain pursuant to *Colorado River*.

However, the *Colorado River* abstention doctrine framework does not apply where the federal court action is one for a declaratory judgment. This is because federal court declaratory judgment actions are discretionary, and the "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.

To determine if a district court's decision to exercise jurisdiction was appropriate under the Declaratory Judgment Act, this Court applies a five-factor test. *Cardinal Health, Inc.*, 29 F.4th at 796–97 (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). This test, known in this Circuit as the *Grand Trunk* test, requires the Court to consider:

(1) whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

(5) whether there is an alternative remedy which is better or more effective.

*Id*. at 796–97. This Court does not assign any factor any particular weight or consider the factors equally, but instead the "essential question on review 'is always whether a district court has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would

be useful and fair.'" *Id*. at 797 (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014)).

In this case the district court applied only the *Colorado River* abstention doctrine factors and failed to consider the *Grand Trunk* factors. The failure of a district court to consider or analyze any of the *Grand Trunk* factors can constitute reversible error under the abuse of discretion standard. *See AmSouth Bank v. Dale*, 386 F.3d 763, 785 (6th Cir. 2004) (determining that district court abused its discretion in assuming jurisdiction over declaratory action where it noted *Grand Trunk* test but did not apply each factor); *see also Byler v. Air Methods Corp.*, 823 F. App'x 356, 365 (6th Cir. 2020) (determining that district court abused its discretion in declining jurisdiction where "[a]lthough the district court acknowledged these factors, the court did not appear to apply them and otherwise included only three lines of analysis explaining its decision to decline jurisdiction.").

In this situation, however, some of the *Colorado River* abstention factors and the *Grand Trunk* factors are similar and both tests require the district court to consider similar principles: "efficiency, fairness, and federalism." *Hoey*, 773 F.3d at 759; *cf., Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (noting that "considerations of judicial economy and federal-state comity" in addition to "comprehensive disposition of litigation" are the underlying principles for *Colorado River* abstention) (citing *Colorado River*, 424 U.S. at 817). We may consider in the first instance, without remanding, whether the five *Grand Trunk* factors warranted the exercise of the district court's discretion to hear the action. *See Byler*, 823 F. App'x at 365 ("it is within our discretion to weigh the *Grand Trunk* factors where the district court has not done so, rather than remanding for the district court to do so in the first instance") (citing *Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 277 (6th Cir. 1990), *abrogated on other grounds by Wilton*, 515 U.S. at 289–90)).

Accordingly, this Court will weigh the *Grand Trunk* factors and determine whether the district court's exercise of discretion was appropriate.

### 1. Whether the declaratory action would settle the controversy

In deciding this factor, we examine whether resolution of the declaratory judgment action will resolve all the disputes between the parties in the underlying state court action. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 556 (6th Cir. 2008) (determining that first factor weighed in favor of exercise of jurisdiction where the district court's resolution of the issue in the declaratory judgment action regarding the scope of an insurance policy resolved all controversies between the parties). In this case, the federal action seeks two declarations: (1) that the settlement agreement between the original lawsuit parties releases Boyd from liability in the state malpractice action and (2) that Boyd is entitled to attorney's fees pursuant to the settlement agreement for defending the state malpractice action and for bringing the federal suit.

If this Court determines that the settlement agreement's release provision applies to Boyd, then the state malpractice action would be dismissed as barred by the settlement agreement under principles of res judicata since the state action involves the same parties. Accordingly, the declaratory judgment action would settle the controversy between the parties. *See Byler*, 823 F. App'x at 366 (citing *Bituminous Casualty Corp. v. J & L Lumber co.*, 373 F.3d 807, 814 (6th Cir. 2004)) (noting that where declaratory judgment action and parallel state action share the same parties and resolution of the federal case would bar re-litigation of state issue pursuant to res judicata, first and second *Grand Trunk* factors weighed in favor of exercise of jurisdiction). This factor weighs in favor of an exercise of jurisdiction.

**2. Whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue**

The first two *Grand Trunk* factors are closely related, and courts often examine them in conjunction with one another. *See e.g., Hoey*, 773 F.3d at 760 (considering the first two *Grand Trunk* factors together). Indeed, "it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." *Flowers*, 513 F.3d at 557; *see also Massachusetts Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759 F. App'x 431, 438 (6th Cir. 2018) ("In general, courts tend to consider this factor with the first factor, reaching the same conclusion for both.").

In this case, the issuance of the declaratory judgment action will clarify the legal relations in issue by determining whether the settlement agreement executed by the parties to the original lawsuit also applies to Boyd, whether the terms of the release provision in that settlement agreement apply to the state malpractice action, and whether Joe owes Boyd any attorney's fees pursuant to the settlement agreement. These determinations clarify the legal relationship between the parties and thus weigh in favor of an exercise of jurisdiction. *See United Specialty Ins. Co. v. Cole's Place, Inc.,* 936 F.3d 386, 399 (6th Cir. 2019) (determining that second factor weighed in favor of jurisdiction where the federal declaratory judgment action settled the legal relationship between an insurer and insured under a contract, even if it did not resolve the right of all parties to the underlying state court action).

**3. Whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata**

This factor examines whether the party bringing the federal court declaratory judgment action has improper motives or is filing the federal action to "start a race for res judicata." *Cardinal Health, Inc.* 29 F.4th at 797 (noting that procedural fencing "refers to 'a range of tactics that courts

regard as unfair or unseemly'" but that if improper motive is not found, the factor is usually weighed as neutral) (quoting *Hoey*, 773 F.3d at 761).

In this case, there is no evidence of procedural fencing or other improper motives in bringing this declaratory judgment action because the action was brought in the forum prescribed by the settlement agreement's forum selection clause. Boyd had no role in drafting or agreeing to the settlement agreement's terms and was required to file any action "to enforce, interpret or evade the terms" of the settlement agreement "in a federal or state court in Davidson County, Tennessee." Settlement Agreement, R. 11, Page ID #93.

In fact, it is Joe, as a signing party to the settlement agreement, who was aware that both of his lawsuits were pending in Williamson County, and yet agreed to a forum selection clause requiring any interpretation or enforcement of the settlement agreement to take place in Davidson County. Furthermore, it is Joe who sought to invoke federal jurisdiction by removing the action from Davidson County state court to federal court. As the district properly determined, this case does not present the concern of "strategically duplicative litigation unilaterally orchestrated by one side of a dispute." Mem. Op., R. 46, Page ID #991. Accordingly, this factor is neutral. *See Cardinal Health*, 29 F.4th at 798 (determining that the district court did not abuse its discretion in finding third *Grand Trunk* factor neutral where there was no evidence of procedural fencing); *Banks Eng'g, Inc. v. Nationwide Mut. Ins. Co.*, No. 21-5652, 2022 WL 203332, at *4 (6th Cir. Jan. 24, 2022) (finding third *Grand Trunk* factor neutral where there was no evidence of procedural fencing because the plaintiff initially filed declaratory judgment action in state court and the defendant removed it to federal court).

11

### 4. Whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction

The fourth factor analyzes concerns about comity between the federal and state courts. *See Hoey*, 773 F.3d at 761. This Circuit considers three additional sub-factors when deciding this factor:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
> (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Cardinal Health*, 29 F.4th at 799 (citing *Flowers*, 513 F.3d at 560).

With respect to the first sub-factor, the underlying factual issues in the state malpractice action (whether Boyd committed malpractice) are not relevant to the determination of whether the settlement agreement releases Boyd from liability in the malpractice action. Accordingly, this sub-factor weighs in favor of jurisdiction. *See United Specialty Ins. Co.*, 936 F.3d at 400–01 (determining that fourth *Grand Trunk* factor favored jurisdiction where the issues in the state court case related to the defendant's liability to injured victims of a shooting and where federal declaratory action focused on separate legal question of whether insurer was required to defend the defendant in the underlying state lawsuit pursuant to an insurance contract); *see also Flowers*, 513 F.3d at 561 ("Because the question of the scope of Scottsdale's insurance policy is an issue of law. . .and does not require factual findings by the state court, the first sub-factor supports the district court's exercise of jurisdiction in this case").

Second, this case involves an ordinary application of state contract law principles and involves no novel question of state law nor an unusual application of factual issues that would make the state trial court a better forum for resolving the dispute. *See Hoey*, 773 F.3d at 761 (noting that where the case does not raise a "novel or difficult question[] of state law" and where the state trial court was not in a better position to evaluate the factual issues, the case "does not raise serious concerns about federal encroachment on the state courts, such that the district court should decline jurisdiction."). This sub-factor weighs in favor of resolution by the federal court.

Third, this case is brought pursuant to diversity jurisdiction and thus does not implicate federal substantive law. This third sub-factor weighs against an exercise of jurisdiction because the interpretation of contracts is resolved solely by interpreting state law. *See Flowers*, 513 F.3d 546, 561 (noting that third sub-factor counsels against jurisdiction where legal issue was interpretation of insurance contract in accordance with state law).

Given that two of these three sub-factors weigh in favor of exercising jurisdiction, the fourth *Grand Trunk* factor also supports the district court's decision to exercise jurisdiction in this action. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003) (finding that fourth *Grand Trunk* factor weighed in favor of jurisdiction where first two sub-factors supported jurisdiction, but third sub-factor did not because the action was governed solely by state contract law); *W. Am. Ins. Co. v. Prewitt*, 208 F. App'x 393, 399 (6th Cir. 2006) (noting "we cannot conclude that the district court abused its discretion when it determined that the fourth factor as a whole weighed in favor of exercising jurisdiction, given that two out of the three sub-factors also favored an exercise

13

of jurisdiction by the district court."). Accordingly, given the relative simplicity of this contractual dispute, the balance of these three sub-factors weighs in favor of jurisdiction.

### 5. Whether there is an alternative remedy which is better or more effective

The alternative remedies in this case are to (1) remand the case back to Davidson County state court or (2) stay this action pending the results of the state malpractice action in Williamson County court. The first remedy was not requested by the Defendant. In fact, it was Joe who removed this case to the federal court in the first instance and sought to invoke the district court's diversity jurisdiction. The second remedy was requested but is not a better or more effective remedy because it would not have provided a final resolution of all the issues in this case. This is because Boyd has also sought a declaration that he is entitled to attorney's fees pursuant to the settlement agreement for defending the malpractice action and for bringing the instant declaratory judgment action.

The district court noted that: "this court could stay this litigation, wait for the Malpractice Lawsuit to reach total conclusion, and still have work to do." Mem. Op., R. 46, Page ID #990. Because a stay of the declaratory judgment action pending the resolution of the malpractice action would have resulted in a delay and would not have resolved all of the claims at issue in this suit, such an alternative would have been worse, not better. *See Flowers*, 513 F.3d at 562 (determining that requiring the declaratory plaintiff to wait until the conclusion of the state proceeding and then file an indemnity action "would not have been a superior alternative" where it would require declaratory plaintiff to wait until the state case was resolved before it could determine its obligations towards the defendant); *see also Byler*, 823 F. App'x at 367 (noting that the "plaintiffs' option of raising preemption and other contract defenses in a future state-court action would be

clearly inferior to a federal declaratory remedy given that it would require plaintiffs to wait until Air Methods sued to collect their fees"). Accordingly, this factor supports an exercise of jurisdiction.

### 6. Balancing the *Grand Trunk* factors

This Circuit has never indicated how the five factors should be balanced but has emphasized that the weighing of these factors "will depend on the facts of the case." *Cardinal Health, Inc.*, 29 F.4th at 801 (citing *Hoey*, 773 F.3d at 759). The first, second, fourth, and fifth factors all weigh in favor of jurisdiction, while the third factor is neutral. *See United Specialty Ins. Co.*, 936 F.3d at 402 (determining that district court did not abuse its discretion in determining that jurisdiction was proper where first two *Grand Trunk* factors supported jurisdiction, third and fourth factors were neutral, and fifth factor weighed against exercise of jurisdiction); *Prewitt*, 208 F. App'x at 400 (determining that where four of the five factors weighed in favor jurisdiction, district court did not abuse its discretion in hearing declaratory judgment action).

Because the balance of factors supports the district court's decision to exercise jurisdiction over this case, we **AFFIRM** the district court's decision to deny Defendant's motion to dismiss.

### B. Motion for Summary Judgment

The district court's order granting in part and denying in part Boyd's motion for summary judgment determined that (a) the settlement agreement's release provision applied to Boyd since he served as a past attorney to a party to the settlement agreement but (b) the settlement agreement's attorney's fees provision applied only to the listed parties to the Agreement.[6] On appeal, Joe argues that the district erred in granting Boyd's motion for summary judgment because: (1) the circumstances surrounding the execution of the settlement agreement, as well as the

---

[6] This latter issue has not been appealed and so will not be addressed in this opinion.

settlement agreement's terms, do not demonstrate that Boyd should be released as a matter of law; (2) Boyd lacked standing to bring the declaratory judgment action since he was not an intended third-party beneficiary of the settlement agreement; and (3) Boyd engaged in impermissible claim-splitting by filing the instant suit.

### 1. Settlement agreement's applicability to the malpractice action against Boyd

The parties do not contest that the agreement should be interpreted in accordance with Tennessee law on the interpretation of contracts; they disagree about whether Tennessee contract law permits courts to consider extrinsic evidence when the contract is unambiguous. Joe claims that the district court failed to conduct the proper analysis in determining that the settlement agreement releases Boyd of liability from the malpractice action. Joe argues that a court is required to examine the facts and circumstances surrounding the release's execution, even after the court has decided that the language of the contract is clear. He claims that the district court erred by not considering his actions in continuing to prosecute the malpractice action after the execution of the settlement agreement as evidence that his intent in signing the settlement agreement was not to release Boyd of any liability in the malpractice action.

Tennessee's rules of contract interpretation do not vary significantly from ordinary principles of contract interpretation. When interpreting a contract, Tennessee courts seek to "ascertain and give effect to the intent of the parties" by examining "the plain and ordinary meaning of the written words that are contained within the four corners of the contract." *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (internal citations and quotation marks omitted). Ascertaining the intent of the parties to a contract is a question of law for the court. *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335–36 (Tenn. 1983). If a contractual provision "is clear and unambiguous, the literal meaning of the

contract controls the dispute . . . and the language used in the contract is construed using its 'plain, ordinary, and popular sense.'" *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014) (quotation marks and citations omitted).

Tennessee courts employ the "rule of practical construction" when discerning the contracting parties' intentions, which permits courts to examine "the circumstances in which the contract was made, and the parties' actions in carrying out the contract." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 692 (Tenn. 2019) (quotation marks and citations omitted). This rule of practical construction, however, does not permit a court to "vary, contradict, or supplement the contractual terms in violation of the parol evidence rule," particularly where the agreement at issue is a fully integrated contract. *Id*. at 698.

A release is a type of contract and the same rules of construction are applied to interpret a release provision. *See e.g.*, *Maggart*, 259 S.W.3d at 704 (applying rules of contractual interpretation to determine scope of release). The scope of a release depends on the intent of the parties as expressed in the written contract and "in the light of all of the surrounding facts and circumstances under which the parties acted." *Peatross v. Shelby Cnty.*, No. W200802385COAR3CV, 2009 WL 2922797, at *3 (Tenn. Ct. App. Sept. 10, 2009) (quoting *Evans v. Tillett Bros. Constr. Co., Inc.*, 545 S.W.2d 8, 11 (Tenn.Ct.App.1976)).

In this case, the release provision clearly applies to Boyd as a "past . . . attorney[]" to at least two[7] of the parties to the settlement agreement. Settlement Agreement, R. 11, Page ID #90–91. The release provision also applies to the claims brought in the malpractice action, since it was

---

[7] Joe admitted that Boyd represented him and his brother simultaneously but disputes whether Boyd also represented Altergott.

17

pending at the time the settlement agreement was executed and since the malpractice action solely related to Boyd's dual representation of Joe and Chris in the context of the 3-D Group joint venture.

In an affidavit submitted by his attorney, Ben Rose, Joe concedes that the generic release was not wrongfully obtained and that its language is clear in its application to Boyd. Joe's attorney stated in the affidavit that: "the Defendants do not maintain the generic release was wrongfully obtained or its language is unclear with regard to Mr. Boyd's novel claim of release." Aff. of Ben Rose, R. 36, Page ID #923. Joe nonetheless argues that the circumstances at the time of the execution of the settlement agreement make clear that he never intended to release Boyd from liability in the malpractice action by signing it. He relies on his own affidavit as evidence that he did not intend to release Boyd from liability and argues that if he had intended to release Boyd, the settlement agreement would have included the malpractice action in the section of the settlement agreement providing for the dismissal with prejudice for pending actions involving the parties. Accordingly, the issue is whether Joe's affidavit creates a genuine issue of material fact on the intent of the parties to release Boyd in the settlement agreement.

Although Tennessee law permits courts to consider the circumstances and facts under which the parties acted, courts may not use that evidence to vary the clear and unambiguous terms of a contract. *See Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 700 (determining that trial court could not rely on testimony of pre-signing intent to "to directly contradict the plain terms of the agreement" and that such evidence was "ineffective to alter, vary, or supplement the clear written terms of the contract."); *Peatross*, 2009 WL 2922797, at *4 (noting that in "matters of unambiguous written instruments absent proof of fraud, misrepresentation, undue influence and situations of like character, the unspoken subjective intent of a party is not relevant.") (quoting *Malone & Hyde Food Servs. v. Parson,* 642 S.W.2d 157, 159 (Tenn. Ct. App. 1982)).

18

Here, just as in *Individual Healthcare Specialists*, the contract contains an integration clause and its release provision is unambiguous, making it inappropriate to rely on any extrinsic evidence on the subjective pre-signing intent of the parties to alter or vary the plain terms of the release provision. Moreover, just as in *Peatross*, Joe's affidavit offers only his "subjective impression" of his intent in signing the settlement agreement and offers no "independent facts or circumstances from which a jury could conclude that [the parties] did not intend to release" Boyd. *Peatross*, 2009 WL 2922797, at *4 (determining that affidavits submitted by plaintiff to prove the subjective intent of the parties with respect to the signing of a release did not affect interpretation of release where the plain language of the release was unambiguous regarding scope).

In all those cases where a Tennessee court has considered extrinsic evidence in determining the scope of a release, the party seeking to introduce that evidence has claimed that a misrepresentation, fraud, undue influence, or mistake motivated their signing of a release. *See Ewan v. Hardison L. Firm*, No. W2011-00763-COA-R3CV, 2012 WL 1269148, at *7 (Tenn. Ct. App. Apr. 16, 2012) (permitting extrinsic evidence despite clear contractual language where the plaintiff sought to avoid enforcement of release provision on the basis that he signed release due to misrepresentation by defendants); *Marlett v. Thomason*, No. M2006-00038-COA-R3CV, 2007 WL 1048950, at *7 (Tenn. Ct. App. Apr. 5, 2007) (permitting extrinsic evidence despite clear language in release where the defendant made false representations that affected the plaintiff's decision to sign release); *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991) (permitting extrinsic evidence that did not alter or vary the terms of the contract but showed that country club specifically rejected several prior versions of contract which contained broad language releasing defendant from any liability arising out of construction project in favor of language that merely indicated that country club approved the facilities constructed by

the defendants). By contrast, in this case, Joe has not claimed that his signing of the contract was motivated by any of those circumstances.

Moreover, the general circumstances under which the parties entered into the settlement agreement support the plain text interpretation of the release provision. The contract's preamble and other provisions reveal that the parties intended to "resolve all differences between them" related to the joint venture for the sole purpose of "making peace and avoiding litigation." Settlement Agreement, R. 11, Page ID 89, 91. Given that any lawsuit relating to the joint venture (even if it was not brought by one listed Party against another) could potentially involve the taking of discovery from a signing party,[8] the circumstances reveal that the parties intended to execute a broad release to resolve all conflict and avoid litigation related to the joint venture.

Joe also notes that he has continued to prosecute the malpractice action even after signing the settlement agreement, which he argues shows that he did not intend to release Boyd in signing that Agreement, citing *Kelley v. Apria Healthcare, LLC*, 232 F. Supp. 3d 983, 990 (E.D. Tenn. 2017)[9] for the proposition that even where a contract's language is unambiguous, courts can consider post-contract conduct. While post-contract conduct of the parties can "in some circumstances, elucidate the parties' own interpretation of their agreement," *Individual Healthcare Specialists, Inc.*, 66 S.W.3d at 700, it does not in this case because Boyd was not a party to the settlement agreement. In those cases where Tennessee courts examine post-contract conduct, it is between parties to a contract to assess what their course of dealing has been. *Hamblen Cnty.*, 656

---

[8] In fact, Joe's attorney has sought to take the depositions of the nominal defendants in the federal district court action (Altergott and Chris Martinez) and their respective corporate entities "to determine those Parties' intent in entering into the generic release." Ben Rose Aff., R. 36, Page ID #923.

[9] *Kelly* is not binding on this Court and appears to have misconstrued Tennessee case law on parol evidence. As demonstrated above, while Tennessee courts do consider the facts and circumstances surrounding a contract's signing to interpret a contract's terms, those facts and circumstances cannot modify or alter a contract's unambiguous terms in the absence of an exception to the parol evidence rule.

S.W.2d at 335 (Tenn. 1983) (noting that "the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered.").

Permitting Joe to alter the terms of the contract through his unilateral subsequent conduct would negate the reliability and value of contracts and could create the potential for parties who regret signing contracts to cast doubt on their prior intentions, as expressed in the plain language of a contract, by breaching the contract. *See Dick Broad. Co. of Tennessee*, 395 S.W.3d at 672 (noting "it would be inadvisable to allow a trial court to consider a contracting party's argument that 'my lawyer told me it would be okay' as a defense to a breach of contract action where the written agreement clearly and unambiguously supports the contrary conclusion."); *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) ("to allow a party to a contract to admit that the party signed the contract but to deny that the terms of the contract express the party's agreement would destroy the value of contracts.").

Accordingly, we find that the district court committed no error in analyzing the settlement agreement and determining that the plain language of that contract released Boyd from liability in the malpractice action.

## 2. Boyd's standing to bring the declaratory judgment action as third-party

Joe also argues that Boyd lacked standing to bring the declaratory judgment action to interpret the settlement agreement because he is not an intended third-party beneficiary of the contract. Tennessee courts permit third parties to benefit from a contract they are not a party to under certain limited circumstances. Tennessee courts examine the following three factors when determining whether a nonparty can enforce the terms of a contract:

(1) The parties to the contract have not otherwise agreed;
(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and
(3) The terms of the contract or the circumstances surrounding performance indicate that either:
    (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the [third party]; or
    (b) the promisee intends to give the [third party] the benefit of the promised performance.

*Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016) (alterations in original).

All three of these factors exist in this case. First, the contract contains no provision that explicitly limits enforcement of the contract to the parties. In fact, the contract's release provision suggests the parties intended the contract to discourage any further litigation on the subject of the joint venture, even if brought against a non-party to the agreement. Second, the contract's express terms evidence the parties' intent to avoid further litigation relating to the joint venture. Permitting Boyd to bring suit to enforce the settlement agreement's release provision would not undermine the contracting parties' expressed goal of "making peace and avoiding litigation." Settlement Agreement, R. 11, Page ID #91.

Finally, part (b) of the third factor is also met here since the contract's release provision is worded broadly to exempt from liability a broad range of individuals, including past, present, or future attorneys that have done any work relating to the joint venture. *See Peatross*, 2009 WL 2922797 at *4 (determining that specific provision in contract releasing "any other person" from liability applied to release any claims against defendants, who were not parties to release agreement). The settlement agreement's release provision specifically names a broad range of individuals, evidencing the parties' intent to give these third parties the benefit of the release provision's assurance that they will not be liable for any of the services they provided with respect to the joint venture. *See First Tennessee Bank Nat. Ass'n v. Thoroughbred Motor Cars, Inc.*, 932

S.W.2d 928, 930 (Tenn. Ct. App. 1996) (noting that "intent to benefit may be shown if there is. . . an expression in the contract that the contracting parties intended to benefit the third party") (internal quotation marks omitted).

Accordingly, the settlement agreement's plain terms reveal that Boyd is an intended third-party beneficiary and is permitted to bring the instant suit requesting a declaration that the agreement's release provision is applicable to him.

### 3. Impermissible claim splitting

Finally, Joe argues that Boyd engaged in impermissible claim splitting by filing the declaratory judgment action in Davidson County. Claim splitting is a variant of the doctrine of *res judicata* that does not require a final judgment but does require that there be sufficient similarity between the underlying factual circumstances such that an eventual final judgment would have barred the second suit. *See Waad v. Farmers Ins. Exch.*, 762 F. App'x 256, 260 (6th Cir. 2019) (noting that the test for claim splitting examines "whether the first suit, assuming it were final, would preclude the second suit") (citation and quotations marks omitted). Claim splitting doctrine stems from the Supreme Court's instruction in *Colorado River* that courts should avoid duplicative litigation. *See id.* (citing *Colorado River*, 424 U.S. at 817).

Claim splitting, however, is inapplicable in this case because the doctrine does not apply to claims that were not ripe at the time of the first suit. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 530 (6th Cir. 2006) (determining that res judicata did not bar plaintiff's claims where they were premised on actions occurring after she filed her first complaint and rejecting theory that plaintiff could have amended complaint to account for ongoing alleged wrongdoings because amending a complaint is not an obligation). The claims that Boyd asserts in the declaratory judgment action—that the settlement agreement applied to foreclose the malpractice action— were

not ripe at the time that Joe filed the malpractice action because the settlement agreement was not filed until several months later. Accordingly, Boyd was not barred from bringing the declaratory judgment action after learning of its existence and implications for releasing him from further liability for his work on the 3-D Group joint venture.

Furthermore, claim-splitting is also inapplicable where a party agrees that a plaintiff may split claims. *See Davis v. Sun Oil Co.*, 148 F.3d 606, 612 (6th Cir. 1998) (noting that claim splitting is only permissible where the parties have agreed in "terms or in effect" that the plaintiff may split the claims). In this case, the settlement agreement's terms mandate that any action to enforce or interpret its terms be brought in a specific forum (Davidson County), that is different from the forum where all the lawsuits originally brought by Boyd were initiated (Williamson County). Accordingly, to the extent that claim splitting is at issue, Joe has, "in effect," consented to the claim splitting by signing the settlement agreement and agreeing to its provision requiring any action relating to the settlement agreement to be brought in Davidson County. *Id.*

## IV. CONCLUSION

Accordingly, we **AFFIRM** the district court's order granting in part Boyd's motion for summary judgment and denying Joe's motion for summary judgment.